and 9th v. Health and Human Services. We're going to deal with them jointly. Is that correct, Mr. Domlin? Yes, that's correct. And that's with your consent, Ms. Chincaplin? It is, Your Honor. Okay. Then let's proceed. Great. Good morning, Your Honors. May it please the Court. My name is John Domlin, and I represent the Secretary of Health and Human Services. Petitioners in these Vaccine Act cases claim that the hepatitis B vaccine caused them to develop a condition known as autoimmune hepatitis. The Special Master rejected those claims, but the Court of Federal Claims set aside those findings on the ground that the Special Master was barred from assessing the credibility of Petitioner's chief expert witness, Dr. Volante. This Court, however, has held both before and after the Court of Federal Claims decision here that Special Masters are entitled, and indeed expected, to weigh the credibility of expert witnesses. This is, frankly, an unremarkable feature of our legal system. Special Fact Finders regularly assess the credibility of expert witnesses that appear before them, and in fact, this Court, in a variety of other contexts, including in patent cases and Tucker Act cases, has recognized that. Well, we can ask the other side, but it just seems that it appears that there may no longer be a dispute on that particular part. That's certainly the way we read their brief, Your Honor. So it might be helpful, at least to me, if you would go to, assuming then that this standard is arbitrary and capricious, and again we'll probe as to whether or not we all agree with that, the arguments they make in red with regard to whether or not the Special Master's decision was arbitrary and capricious. Absolutely, Your Honor. I'm happy to move on to that. Petitioners, as you note, focus entirely, their challenge entirely, on the Special Master's factual findings. Those are viewed, as you note, under the highly deferential arbitrary and capricious standard. We think that standard is essentially dispositive of both appeals. The Special Master, under that standard, this Court doesn't re-weigh the factual evidence. That's essentially what the petitioners are asking this Court to do. And I'm happy to go through the details of the factual findings, which the Special Master... Well, let me ask you first. If in fact we agree with you that the lower court's sort of blanket approach to this was wrong, as it relates to simply discarding every finding on the basis that the credibility discussions were too extreme, wouldn't it be more appropriate for us to remand to the lower court so that those arbitrary and capricious findings can be made under the appropriate standard? I mean, I don't think there would be much point to that. This Court's review of the Court of Federal Claims decision is de novo, and so it would seem to be somewhat of a waste of time to send it back to the Court of Federal Claims to engage in arbitrary and capricious review of the Special Master's fact findings, only to end up back in this Court on de novo review of the Court of Federal Claims decision. But de novo doesn't mean in the first instance, though. It means we're looking at it again completely, and we have the right to disregard the findings, but we're not supposed to be the first prong on this analysis, are we? Well, I would point out that petitioners aren't asking for a remand in the alternative. This Court has before it the entire record that was before the Court of Federal Claims. There's no reason to think that the factual record could be developed further when it goes below. In fact, the Court of Federal Claims has borrowed from itself taking new evidence, and so it would be, I think, just more efficient of this Court having the record and the party's arguments if it were to decide itself whether the Special Master's findings were arbitrary and capricious. I think that would just be a much more quicker way to go rather than delay these proceedings any longer. Let me ask you what may be more of a legal question then than an arbitrary and capricious thing, and I'm a little confused about that. This is with respect to the alternative causes. In one of the cases, I think, Porter, the Special Master did find, sort of put the burden on the government, as I recall, in terms of the alternative cause with the other drug. That's correct. But it seems to me in the other case, he didn't necessarily do that. Now, we can get to the point of whether or not he could or he couldn't do it, but is that your read as well, that he didn't view the alternative fibrosis analysis and all of that stuff? He continued to put the burden on the petitioner in that respect? Yes, that's my reading, but there was nothing necessarily improper about that. Certainly petitioners aren't challenging the Special Master's finding on that basis. Essentially, what the Special Master found in Ms. Rotoli's case, this is the Knight case, was that her receipt of the vaccine that was based on the unequivocal testimony of the government's expert, Dr. Koff, examining the liver biopsy of Ms. Rotoli. That is something that petitioners had to explain for the purposes of their affirmative case. This wasn't an alternative cause. This was simply the claim that if you are going to prove a causal link, then you have to demonstrate why the timing was appropriate. It goes sort of first to the first prong of the alphan test and also to the third prong, approximate temporal relationship. They couldn't demonstrate certainly that third prong at the very least. Now, looking at the Knight case for a moment, we have a Huppert's case study which suggests that maybe fibrosis could develop in less time. That's correct, Your Honor, but the Special Master quite reasonably, and again this is on arbitrary and capricious review, quite reasonably discounted that case study. It noted that case reports are of limited probative value because they're the report of only a single case. And in any event, even looking at what the case report said, it credited the explanation of Dr. Koff. Dr. Koff testified quite sensibly that the subject of the study had been suffering from asymptomatic autoimmune hepatitis for a long period of time before he was diagnosed with hepatitis A. The Special Master was well within its broad discretion, fact-finding discretion, to credit Dr. Koff's explanation of the Huppert's case study. The Huppert's case study also discussed a supposed connection between hepatitis A and autoimmune hepatitis, so it was an opposite in several respects. Dr. Koff testified in both cases, right? He did. These cases were combined with three others at trial, so Dr. Belanti and Dr. Koff and the government had provided another expert, Dr. Zweiman, testified in that combined trial. We've had a lot of discussion about whether Dr. Belanti was discounted by the Special Master relying on other expert testimony, that of Dr. Koff. Yes, absolutely. Certainly it's within the power of the Special Master to credit the government's expert witness or credit an expert witness on either side if that expert witness is providing testimony that seems to hold together and isn't directly contradicted by any extrinsic evidence. That's certainly within the power of the fact-finder. And in the Porter case, at least, Dr. Belanti admitted that his favorite theory was wrong. Exactly. The theory of... I forget the name of the theory. I'm sorry, Your Honor. But yes, his favorite theory... Is it the T-cells? Well, it was the first theory was... The molecular mimicry. Molecular mimicry. Thank you, Your Honor. Thank you, Your Honor. Yes, molecular mimicry. He conceded when the government presented evidence showing that there were no re-challenge events. A re-challenge event is when someone with pre-existing autoimmune hepatitis received a hepatitis B vaccine, their condition didn't worsen. And when the government presented him with that evidence, he acknowledged that that completely undermined what he once called his favorite theory and that he said that we would have to look for another explanation. The special master quite correctly concluded that that was a mark against Dr. Belanti's overall credibility. And so quite reasonably said, well, I have to look with a skeptical eye at anything that Dr. Belanti is telling me if he is saying things in his expert report that he can't back up. Let me ask you a little bit about those credibility findings. Even if everyone agrees that the credibility assessments here, every time he disagreed with anything Dr. Belanti said, he essentially called the man a liar. I mean, that's going a lot further than making a credibility assessment, isn't it? I think that's a harsh assessment of what the special master did. I think the special master was looking at the merits of what Dr. Belanti was saying and recognizing that when Dr. Belanti said, for instance, that in his expert report, he said, there are reports in the literature that demonstrate that rechallenge events occur after someone who has autoimmune hepatitis takes the hepatitis B vaccine. That was explicit, unambiguous statement in his expert report. And then it comes to trial and he's unable to provide any such literature. And in fact, backs away from molecular mimicry when he sees the government's literature showing that the opposite was true, that there were no rechallenge events when someone who had autoimmune hepatitis received the hepatitis B vaccine. And over and over again, those were the sorts of credibility determinations that the special master was making. This wasn't a claim that Dr. Belanti was lying. This was a claim that he was unable on the substance of his assertions, was unable to provide any supporting evidence. That's perfectly. But if you read those last nine pages, there's no way you can get around the conclusion that he's calling him a liar. I think he never calls him a liar explicitly. He says that he made statements in his expert report that which were turned out not to be true. That's certainly well within the rights of a fact finder to do. Well, one of the things he attacks him on, let me give you an example in the Porter case, is he attacks him on his inability to pinpoint the exact date in which her illness began. And yet, that's not the standard, is it? No. Just within a medically acceptable time frame. No, that's not the standard. But there was, again, nothing wrong with the special master's overall approach to addressing Dr. Belanti's testimony. You may be able to quibble with certain things that the special master did. Well, he applies the wrong standard. And he says, you have to give me an exact date. And then when he doesn't give him an exact date, he said, that's evidence of your lack of worth-rightness, that you can't give me an exact date, even though everyone agrees that it would be impossible to give an exact date for an illness like this. I believe that the point of that statement was that Dr. Belanti, in neither case, could even give a sense of a range of dates for when either Ms. Rotolis or Ms. Porter's autoimmune hepatitis began. As far as I know, he couldn't even hazard a guess. And so I think that was the main thrust of it. There were a range of dates, though. I mean, if that conclusion was determinative, we could easily find that to be arbitrary and capricious. Could we not? I wouldn't want to concede that. But I would just say that that wasn't the only thing that the special master was criticizing Dr. Belanti for. There were many other. I gave one example. There were many other examples of where, with respect to the medical theory in particular, and Dr. Belanti was principally testifying as to the general causation, the medical theory causally connecting the vaccine to the disease, he was unable to substantiate the claims that he made in his expert report. And so that was the main thrust of that entire nine-page section at the end of the special master's decision. In any event, even if you thought that there was some error in the credibility determinations, as we pointed out in our opening brief, the non-credibility determinations in and of themselves were sufficient to affirm the special master's findings. One example being, in Ms. Rotolis' case, the finding that her autoimmune hepatitis predated her receipt of the vaccine. That was based entirely on the testimony of Dr. Coff. Dr. Belanti, for his part, when asked directly about Ms. Rotolis' case and presented with the government's point, the government's analysis of the liver biopsy, said that he honestly didn't know when her autoimmune hepatitis began. Did Dr. Belanti have any particular qualifications in diseases of the liver? No. Dr. Belanti was an immunologist, a general immunologist. Dr. Coff, on the other hand, was a hepatologist, studying directly diseases of the liver. He'd been studying it for over 40 years. If we're talking about hepatitis, we probably need a liver expert, don't we? That exactly is correct, Your Honor. And in fact, the special master gave the petitioners an opportunity to bring on a hepatologist as an expert witness at the beginning of the proceeding before trial, and petitioners did not do so. Instead, they relied entirely on Dr. Belanti, who's an immunologist. So that as well gives Dr. Coff's views somewhat more weight. Do you wish to preserve some of your rebuttal? I believe that I preserved some time already, but I'm happy to preserve the rest. Let's hear from Ms. Chin-Kaplan. May it please the Court. My name is Sylvia Chin-Kaplan, and I represent the appellee here. The claims court reversed the judgment of the special master and premised it on the fact that he had attempted to utilize an improper legal standard, and he cloaked the use of an improper legal standard by credibility analysis. And the special master at that point indicated that the credibility analysis of the witnesses was not reviewable by the trial court. The trial court standard of review, as this court's standard of review, is de novo with respect to issues of law and arbitrary and capricious with respect to findings of fact. And in this particular instance, the appellee asserts that the theories put forth by appellee was more than substantiated by both the medical testimony as well as the evidentiary evidence that's in the record. We're proving causation in fact here. Maybe you could help me with just a kind of common sense theory. Hundreds of thousands of people get hepatitis vaccine every year. Did you put forth any evidence of numerous cases of that being linked to AIH? No, Your Honor. Wouldn't we expect if it was a causative agent that there would be a series of instances where the administration of the vaccine itself would be linked to hepatitis, autoimmune hepatitis? There are several answers to that question, Your Honor. First of all, the incidence of autoimmune hepatitis in the world is not known. It is known for various areas within the world. And it has been estimated at approximately 1.8 perhaps per 100,000 people. And Dr. Belanti's testimony was that the people who develop these adverse reactions to hepatitis B and vaccines in general on either side of the bell-shaped curve, he's indicated that 95 to 99 percent of the people react normally. And petitions have never asserted that all cases of autoimmune hepatitis are related to the administration of hepatitis B. Dr. Belanti indicated that it is those people who are genetically unable, who have an aberrant immune response which is dictated by their genetics, who will react to the vaccine and who will be unable to process the antigen. And what support does he have for that conclusion? What support did he have for that conclusion? His experience in not only treating individuals with autoimmune disorders, but Dr. Belanti also has done research in vaccines. He, at the time of the hearing, was consulting with the NIH on the new anthrax vaccine. I'm sorry, the Defense Department, on the new anthrax vaccine to determine both the safety and the adverse reaction rate. He continues to try and develop an inhalable measles vaccine, which he started when Dr. Sabin was in his laboratory. And Dr. Sabin was the individual who developed the oral polio vaccine. So Dr. Belanti, above all the other experts, had probably the greater ability to determine whether these adverse reactions were related to a vaccine or not. How do you get around, in the Knight case, the evidence from Dr. Koff that this was already in Stage 3 at the point that it was recognized? At any time associated with the vaccine, it was in Stage 3? Your Honor, that was a statement that was indeed made by Dr. Koff. I think it's a factual finding, isn't it? Yes, it's a factual finding based on the liver biopsy results. And the question became, can a person develop Stage 3 cirrhosis within the period of time after the administration of vaccines? And the Huppert's article, which, granted, did look at wild-type hepatitis A. That's one case, right? It is one case. And that's also the article that said we can't exclude the possibility that this one case had underlying AIH, right? That is true. So, in other words, it's pretty tough to base anything on that article, which was probably, first, it's a single case, not a study of an epidemiological character. And it's admitting that there was a chance of underlying AIH. You're correct, Your Honor. However, a few facts here would support Petitioner's position here. The facts are we're dealing with a 7-year-old child who the article indicated really had no risk factors for the development of hepatitis A. He was exposed in his football club, and then he developed an antibody to the hepatitis A, which then disappeared. And Dr. Coff agreed. In fact, he was very proud of the fact that he had diagnosed a case of autoimmune hepatitis after contracting wild-type hepatitis A. So, in this instance, there were few case reports. And Dr. Coff admits also that there are only a few case reports, only six or seven case reports. And there were none that supported Dr. Coff's position, correct? Correct. I mean, his opinion was just his opinion. He had no factual backup for it? He had no backup other than his assertion, and it was based on his clinical practice. And while Petitioner would agree it is only one case report, all the epidemiological studies are underpowered to detect this small risk. When we're dealing with 1.8 cases of autoimmune hepatitis per 100,000 people, and not all the causes are related to hepatitis B vaccine, then we would need huge population studies to determine whether or not hepatitis B led to an increased statistical significance. And we don't have that here, and we probably will never have that here. The difficulty I'm having with this discussion, however, is the standard of review. We're not sort of weighing two pieces of evidence, Dr. Corp, the expert versus this one case study. We're having to evaluate whether or not the finding of the special master was arbitrary, capricious. In other words, based on evidence that is wholly implausible. What is there? I mean, we've got an expert testimony, and we've got this one case study. You think that's sufficient to establish clear that the special master's findings were arbitrary and capricious? And in so doing, would we not have to find that the government's expert was just a liar? A petitioner's position is that once the respondent presents evidence which challenges her position, and it's rebutted, then at that point, it's up to the respondent to turn around and present evidence which supports his position. And in this case, Dr. Corp presented no additional evidence to support his position. And petitioner would agree that in that respect, the special master's finding of fact was indeed arbitrary and capricious. While not mentioned in our brief, but contained within our appendix, Your Honors, is the fact that there is actually another case that supports the rapid onset of cirrhosis after the administration, after the development of autoimmune hepatitis. In the last case article, which was introduced to demonstrate that a person who developed hepatitis B wild virus subsequently went on to develop autoimmune hepatitis. In that case report, the first liver biopsy for that individual demonstrated that she had cirrhosis. The second liver biopsy, nine months later, indicated that she had fibrosis. So there's actually two case reports that support that once autoimmune hepatitis develops, that this process to developing fibrosis can be very rapid. There was some debate about the distinction between the wild virus and the vaccine, but as I read the briefs here on appeal, the parties seem to be conceding that the one would support, it would at least provide evidence as it relates to the other. Yes, you're correct, Your Honor. And in particular, in the Porter appendix, the respondent had submitted an IOM report. And the IOM report validates that the mechanisms described by Dr. Belanti in his testimony are those mechanisms which have been identified for autoimmune hepatitis, for autoimmunity in general. And that testimony was not disputed by the government's immunologist, Dr. Zweiman. In addition, the IOM report also indicates that where the natural disorder can lead to autoimmune hepatitis, and in this particular case they were speaking of hepatitis B, if the wild type hepatitis B virus can lead to autoimmunity, then it can be presumed that the vaccine strain can do similar. And that's from the Institute of Medicine. And that's precisely the type of testimony that Dr. Belanti relied upon when he gave his opinion. Going back to the genetic predisposition to autoimmune diseases, is there anything in the record where the petitioners were tested for mutations in their HLA genes? No, Your Honor. Why wouldn't that have happened? That's not normally done in clinical practice. It's primarily a research protocol. And in all the studies that were presented in which there seems to be a genetic predisposition, they were all done under research auspices. Now, there was an article presented, the Bologna article, which indicated that non-responders had a particular... Well, the case studies did that testing. The case studies when they were reporting the individual cases may have done so, but I can tell you that in the Huppert's article, at least, there was not that type of testing done. Now, with respect to the genetic component, Your Honor, the Bologna article indicated, found that there were 10 non-responders in that article. And of those 10 non-responders, they possessed that type of genetic makeup that made them at risk for the development of autoimmune disorders. Now, while Ms. Bertoli did not have her testing done, I think it would not be a reasonable conclusion to draw that because she was a non-responder, that she would have been within that population that would have developed an autoimmune disorder. And, in fact, she did, and she developed more than one autoimmune disorder. And that is also recognized within medicine, was largely unchallenged by the respondent at the time of hearing. Now, with respect to specific causation, excuse me, petitioners, the appellee believes that they have presented a theory that demonstrates how hepatitis B can cause autoimmune hepatitis. Those theories were not disputed by the respondent at the time of hearing, and they are, in fact, supported by the literature that they submitted on IOM, which describes how autoimmunity occurs in general. They also presented evidence that the natural wild disease of hepatitis B virus can lead to the development of autoimmune hepatitis. And the IOM publication indicates that that is also a reasonable assumption to make. How do you deal with the minocycline issue? Your Honor, the... You've got the patient taking this acne medicine, which is known to cause hepatitis. That has more substantial proof behind it. Yes, you're right about that, Your Honor. The key fact... Continues to take it after they have a bad blood test. The factual evidence supports, Your Honor, that Ms. Porter was told to discontinue the medication two months earlier. And at the time that she received... Earlier than what? The receipt of the first hepatitis B vaccine. And at the time that she received the first hepatitis B vaccine, she, in fact, had blood work drawn because she was on a medication that could affect her liver function tests. And those liver function tests were normal at that time. Within weeks of receiving the third hepatitis B vaccine, her liver function tests were markedly elevated. And at that time, there was no evidence to support the fact that she was taking minocycline at that time. At some point, when did she... She resumed at some point taking that. She did, Your Honor. And when was that? She resumed approximately six weeks later. And when she resumed... After the bad drug test, after the bad blood test. After the elevated liver functions. And when she resumed the medication, her condition did not worsen. And if this was indeed a situation where her autoimmune hepatitis was related to the minocycline, it would have been a re-challenge effect. And she should have had a greater exacerbation of her autoimmune hepatitis. And she did not. Now, in all these cases of minocycline-inducing autoimmune hepatitis, it's considered a drug reaction. And to have a drug reaction, one must be on the drug. And there was no evidence to support the fact that she was taking minocycline at the time that she received her first hepatitis B vaccine. But she got it within two years, which is the expected time, right? Your Honor, there was some testimony to the effect that intermittent usage could also lead to the development of autoimmune hepatitis. But all the cases that were filed indicated that the individuals who developed autoimmune hepatitis after minocycline were taking the drug at the time. Now, Dr. Koff was questioned about how this drug could cause autoimmune hepatitis if the person was not taking it, because the literature all indicates that sometimes the only way in which to determine whether it's an unknown cause of autoimmune hepatitis or whether it's related to the drug is to withdraw the drug, and the person gets better. Now, when Dr. Koff indicated that you can still get autoimmune hepatitis despite not being on the drug, he was asked how this could happen. And he indicated that the drug was lipophilic, that it likes to hang in the fatty tissue. And when it likes to hang in the fatty tissue, it could still act as an antigen. And he was asked how long the drug hung around. He said, well, from the bloodstream it disappears, and half-life is 18 hours. So meaning half of the effect of the drug is gone within 18 hours. And if half of the effect is gone within 18 hours, it can be presumed, I would think, that within a week's time there is no further effect that one would expect to see the drug. So then that's when he brought up this issue that it was lipophilic, and because it hangs around in the tissue, it could perhaps be contributing to the development of autoimmune hepatitis. When he was asked how this could happen, asked to describe a mechanism by how this could happen, he indicated that he's not an immunologist, that it's better to ask an immunologist about the pathogenesis of this disorder. Now, the special master gave you several months to hire a new expert and file new reports. Why didn't you get a hepatologist? Because, as I indicated, a hepatologist treats the disorder. A hepatologist does not look at the pathogenesis of the disease. And Dr. Koff essentially admitted that when he was asked how minocycline could lead to the development of this disorder, and he deferred by saying that he was not an immunologist, that he would look to the immunologist to tell him how this occurred. And since we are dealing with the pathogenesis, how these disorders occur after vaccine administration, and we knew also that the hepatology people, by and large, treat rather than make a determination of how it occurs, that it was not necessary for us to put forth another expert. Now, not only did the acolyte assert that the special master cloaked an improper legal standard by utilizing a credibility standard, they also believed that the repeated requirement to show how the hepatitis B vaccine led to the development of autoimmune hepatitis violates what this court has indicated as the precise biological mechanism by how a vaccine injures an individual. And that was raised many years ago in Knudsen, which indicated that is not petitioner's burden. The petitioner also believes that by the court's repeated requirements for literature to support the biological mechanism, it was an attempt to resurrect the discredited Stevens-Prongs tube, which required objective evidence of medical plausibility through either the medical community or scientific literature. Well, in fact, one of the government's experts said that he wouldn't be satisfied unless there was an epidemiological study. Isn't that right? That's correct, Your Honor. And this court in Andrea specifically indicated that requiring epidemiological studies or general acceptance within the medical community impermissibly elevates petitioner's burden of proof. But there's still a big gap between epidemiology and just sort of saying it's so, right? There is, Your Honor. But the Andrea court also gave guidance on how the parties can proceed when utilizing medical literature and epidemiological studies. They indicated that for those studies, they're to be viewed not through the eyes of the laboratory but through the preponderant evidence of the vaccine act. Now, the epilogue had indicated that there was a study that was performed in which people who already had a diagnosis of autoimmune hepatitis received a hepatitis B vaccine. This case was tried before Andrea came out. And Dr. Belanti is a physician, and he does rely to a certain extent on epidemiological studies. However, when one looks at the data that was presented in that study, there were two populations that were studied, those 1 to 15 who were on treatment and those 16 and above who were not on treatment. Of those four patients who were 16 and above, two of them were non-responders, and one of them was already on a liver transplant list. Those four people received a series of three immunizations. One, the individual that was on the list for a liver transplant had to go into immediate surgery for replacement of the liver. And two of them had elevations of the liver function test but not to the point that there was clinical deterioration. There was subclinical deterioration. Now, if Andrea had been present at the time, the decision Andrea had been present at the time of this hearing, petitioner would have been able to point out that under the lens of the Vaccine Act, those three individuals who suffered a deterioration to subclinical and one who actually required a liver transplant was evidence of re-challenge. And in addition, it also supports petitioner's position that those people who are non-responders do not handle the vaccine component as well as others who have a normal response. Ms. Chin-Kaplan, I keep laboring with the problem that in both cases you have a factual finding that there's a more likely alternative cause suggested by the medical literature and by the experts. Minocycline in the first case and, of course, the preexistence stage 3 fibrosis in the second case. How can we find that those are arbitrary and capricious when they have the backing of very substantial experts as well as a more substantial body of medical literature suggesting that those are real causes of hepatitis, autoimmune hepatitis? How do we find this is arbitrary and capricious when the record is pretty powerful in both cases? It relates to the shifting burdens of proof, Your Honor. And the alternative causation is not reached until petitioner has established by preponderant evidence that the vaccine has indeed led to the autoimmune hepatitis. And for the court to reach that alternative causation, it's a tacit admittance that petitioner at that point had met preponderant evidence. And at that point, it's up to the respondent to demonstrate that the alternative causation was the sole cause. Really? Do you have any case law to support that, I mean, here they found the government had met its burden in one case, in the other case they analyzed this with respect to timing, that that's a per se finding by the special master that you've met your burden if he gets into the analysis of what the alternative causes are? Do I have... Have we ever said that? Has our court ever made that assumption or made that leap? Is there a case in sight? There's nothing specifically on point, Your Honor. However, before one reaches alternative causation, one must first find that the petitioner has established preponderant evidence. And that relates solely to the shifting burdens of proof, which is how we operate in this court. So it's petitioner's position, or at least position, that for the appellant to reach that alternative causation, there must have been some understanding. Well, but always in a legal proceeding, you proceed on several alternative theories, and you have to receive all the evidence that may be necessary. I'm puzzled as to why the special master couldn't take evidence on alternative theories at the same time it was taking evidence on whether you met your burden, which it found you did not. It's not appellee's position that the special master could not take evidence on alternative causation. Clearly, he can take evidence on alternative causation. Once he does that, though, he has to establish by preponderant evidence that the alternative causation is the approximate cause. Why can't the special master say, you didn't prove your case, and by the way, it's also very evident that this was either minocycline in one case or preexistent AIH in the other? He needed to engage in the analysis before he could make that determination. I thought he did. I read the case over pretty well. Yes, he says that he did, Your Honor. However, the petitioner's burden at that point was to provide a theory, and they did provide a theory. It was agreed to by a respondent's expert and, in fact, is supported by a publication of the IOM. And at that point, it just moves to prong two to determine whether there's a logical sequence of cause and effect. And with respect to Ms. Rattoli specifically, that logical sequence indicated that at the age of 25, she had no risk factors to the development of autoimmune hepatitis and that once she received the first shot, she developed these vague symptoms, which is acknowledged to be one of the presentations of an autoimmune hepatitis. It's a difficult diagnosis to make where you can be totally asymptomatic on one hand and be in fulminant hepatic failure on presentation. But you can also, in the middle, have symptoms that are generalized, that are nonspecific. The evidence indicated that after the second administration of hepatitis B, she developed more nonspecific symptoms. And after the third, within 10 days approximately, that's when they found the elevated liver enzymes. Now, the sole cause, the cause which the respondent attempted to show at the time of hearing was that it was preexisting. And it was preexisting based on the finding of the liver biopsy, which you have referred to, Your Honor. And petitioners submitted evidence which demonstrated that the onset of cirrhosis or fibrosis could indeed occur within the eight-and-a-half-month time frame in which the exposure to the hepatitis B vaccine initially occurred. At that point, it was a rebuttable presumption. Now, that would have been a good place to have a hepatologist, right? Because then you would have had somebody who could have given some expert testimony on whether that could actually happen. But you didn't. Well, Your Honor, it seems that from the... Someone who's treated a lot of liver disorders would be able to give some kind of an assessment of that, which, of course, the record only has one assessment, which is that it cannot occur so quickly. Yes, Your Honor. However, that is rebutted to a certain extent by an article which was published, in my opinion, that the Huppert's article was published by a hepatologist. That's the same one that says they can't exclude that that single case study also had preexisting AIH, right? That is true, Your Honor. So that's essentially no evidence. Well, when one looks at the facts of the case, Your Honor, this is a 7-year-old child who had a known exposure to hepatitis A. Hepatitis A, Dr. Koff admitted, has been reported as a trigger to the development of autoimmune hepatitis. And when he was presented with the evidence that that exposure occurred somewhere within 10 to 16 weeks and the development of the fibrosis that was noted in this child's liver bias occurred sometime within that 10 to 16 weeks, and then he tried to disavow that the hepatitis A was the trigger for the development of autoimmune hepatitis when he, in fact, had reported such a case in the literature. And then that's when he resorted to saying that it preexisted the actual diagnosis. When asked what exposures in the past could have led to a preexisting autoimmune hepatitis in the 7-year-old child, Dr. Koff said, antibiotics. But he couldn't demonstrate that the child had been on any antibiotics. So he, in essence, was trying to reinterpret an article which contradicted his testimony. And petitioner's assertion is that this is a rebuttable presumption, and he presented no evidence to support what he was saying. Thank you, Ms. Schenkeppler. Thank you, Your Honor. Mr. Domley, you have six minutes if you need to use it. Thank you, Your Honor.  They are essentially, I think, asking this court to reconsider, reweigh the evidence that was before the special master, and that's, of course, not this court's job. Well, but you just told me before that it is our job to decide whether his conclusions are arbitrary and capricious, so we've got to look to see what is. Absolutely, absolutely. But that is a very high burden for petitioners to carry in this court, and simply pointing to evidence that contradicted the testimony of Dr. Koff is not sufficient. They have to somehow show that there was no other rational thing to do than rule in their favor. Well, let me ask you, didn't the special master put the burden in the wrong place in the Porter case when he said it was the petitioner's obligation to prove that she wasn't the rare case where the effects of menocycling would disappear as soon as she stopped taking the drugs? No, I think that the special master recognized that the burden was on the government to prove the alternative cause, and having proven that alternative cause, I think the special master was simply recognizing that once the government has proven that this is the alternative cause, you have to tell me why it isn't, and there's nothing wrong with that. There's no legal error in that type of reasoning. So you're saying the government proved that it was the alternative cause? Well, yes, that's what the special master... But Koff's only testimony to support that was his suspicion that maybe she was lying about having stopped the drug. That's not true at all, Your Honor. Dr. Koff testified that, as petitioner's counsel noted, that menocycline is a lipophilic drug, that it persists in the body even after one stops taking the drug, and that the latency period for menocycline is quite long. And he testified as to his experience in practicing of seeing at least one patient who had developed autoimmune hepatitis after stopping taking menocycline, and the special master was well within its broad discretion in crediting that testimony. Let me ask you about the Koff and Mueller article that the special master used to discredit the Rosen-McCabe textbook. Isn't it true that Dr. Koff admitted that he hadn't actually read the article because he couldn't translate it and he didn't speak German? I believe that Dr. Koff was looking at the articles that were cited by the textbook. He relied on those articles to say that the textbook got it wrong, but there was no testimony that anyone ever read those articles because they were all in German. I'm not exactly sure what the point of the textbook was. I believe it might have been to demonstrate that wild hepatitis B viruses cause autoimmune hepatitis. The government and Dr. Koff himself disputed that, and the special master found that there was no evidence that wild hepatitis B viruses cause autoimmune hepatitis. That was something that we strongly disputed and the special master found in our favor. The special master said the textbook does support that conclusion, but then said, I think the textbook was wrong because of these articles that no one ever read. I don't know if the articles were in German and the petitioners had to, if they were relying on those articles, they would have had to provide translations. It was the special master that relied on the articles. I really don't know what the importance of the textbook was when we had the article by Dr. Crowett, which both parties agreed was a foremost expert in these subjects, and Dr. Crowett in his article found a connection between hepatitis A and hepatitis C and autoimmune hepatitis, but found no such connection between hepatitis B and autoimmune hepatitis. And so special master certainly was not arbitrary and capricious in crediting the testimony of the government that the wild hepatitis B virus cannot cause, does not cause autoimmune hepatitis, or at least that there was no evidence of such a connection. And so I believe that this entire case falls within the arbitrary and capricious standard of review. It's certainly that standard is dispositive of the case, and we can find little things that maybe we would have done differently if we were sitting as the fact finder, but of course that's not this court's job. And I just want to highlight that the importance of the limited standard of review for ensuring the efficiency of the vaccine compensation program, that was one of the reasons that Congress in 1989 created the Office of Special Masters, and in the conference report for that bill, which created the Office of Special Masters and the arbitrary and capricious standard of review, the conference report stresses that special master's decisions would not be reversed frequently, but only in cases where truly arbitrary decisions have been made. And that limited standard of review is critical to fulfilling the Congress's goal of ensuring the efficiency of the vaccine compensation program, because absent that standard of review, you end up with a proceeding much like we have here, where the parties are just re-litigating the factual dispute that was resolved by the special master, and that would simply be a delay and a waste of time. I have nothing more to add. Thank you.